# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: July 8, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| DAVID BRONIEC, | * | |
| | * | |
| Petitioner, | * | No. 19-1618V |
| | * | |
| v. | * | Special Master Young |
| | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | * | |

*Johnathan Joseph Svitak*, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.
*Sarah Christina Duncan*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On October 16, 2019, David Broniec ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018). Pet., ECF No. 1. Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccine administered on October 16, 2017, and in the alternative, that "his left shoulder SIRVA injury was caused in fact" by the flu vaccine. Sec. Am. Pet. at 1, 5, ECF No. 52. Respondent argued against compensation, asserting that Petitioner could not establish a SIRVA Table claim or causation-in-fact claim. Resp't's Rep., ECF No. 44.

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards, I find that (1) Petitioner does not satisfy the SIRVA Table criteria and (2) that Petitioner has not provided preponderant evidence that the flu vaccine caused him to suffer from a left shoulder "SIRVA" injury. However, I find that Petitioner has provided preponderant evidence that the flu vaccine caused him to suffer from focal myositis, which satisfies his causation-in-fact burden of proof under *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005). Accordingly, Petitioner is entitled to compensation.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

## I. Procedural History

Petitioner filed his initial petition and medical records on October 16, 2019. Pet., Pet'r's Exs. 2–8, Vol. I, ECF No. 1. Petitioner filed additional medical records and an affidavit between October 18, 2019, and June 23, 2020. Pet'r's Ex. 1, ECF No. 6; Pet'r's Ex. 9, ECF No. 12; Pet'r's Ex. 8, Vol. II, ECF No. 14; ECF No. 15. On September 10, 2020, the chief special master held a status conference between the parties. *See* Min. Entry, docketed Sept. 15, 2020. At the status conference it was noted that some medical records may still be outstanding, and thus Petitioner was ordered to review whether such records existed. ECF No. 22 at 3. Petitioner then filed additional medical records on February 16, 2021. Pet'r's Ex. 10, ECF No. 27.

The chief special master held another status conference on June 3, 2021. *See* Min. Entry, docketed June 7, 2021. The chief special master explained that this "appears to be a fairly straight-forward SIRVA claim," but noted that medical records remained outstanding. ECF No. 32. Petitioner also noted that he was attempting to clarify the date of vaccination, and may file an amended petition as a result. *Id.* Petitioner was thus ordered to file any remaining medical records and, if applicable, an amended petition. *Id.*

Petitioner filed his first amended petition on June 11, 2021. First Am. Pet., ECF No. 33. He then filed additional medical records on July 29, 2021. Pet'r's Ex. 11, ECF No. 35. Respondent filed his Rule 4(c) report, opposing compensation, on March 11, 2022. Resp't's Rep. The chief special master subsequently held another status conference on April 13, 2022, after which this case was transferred to my chambers. *See* Min. Entry, docketed Apr. 15, 2022; ECF No. 47.

Petitioner filed a second amended petition on November 30, 2023, to include a causation-in-fact claim in addition to his original Table SIRVA claim. Sec. Am. Pet. Petitioner then filed an expert report from Uma Srikumaran, M.D., on June 3, 2024. Pet'r's Ex. 12, ECF No. 56. He later filed supporting medical literature on June 10, 2024. Pet'r's Ex. 12, Tabs 1–21, ECF No. 58. Respondent filed a responsive expert report from Geoffrey Abrams, M.D., along with his curriculum vitae ("CV") and supporting medical literature on August 9, 2024. Resp't's Ex. A, Tabs 1–2, Resp't's Ex. B, ECF No. 59. Petitioner filed a supplemental report from Dr. Srikumaran on September 20, 2024. Pet'r's Ex. 13, ECF No. 60. Respondent filed a supplemental report and medical literature from Dr. Abrams on October 31, 2024. Resp't's Ex. C, Tab 1, ECF No. 62.

Petitioner filed a motion for a ruling on the record on January 13, 2025. Pet'r's Mot., ECF No. 63. Respondent filed his response on March 14, 2025. Resp't's Response, ECF No. 64. Petitioner did not file a reply.

This matter is now ripe for consideration.

## II. Factual History

Petitioner's prior medical history was significant for eczema, dyspepsia, and residual right shoulder pain and winging after an arthroscopic repair of a traumatic injury he suffered while serving in the United States Navy. Pet'r's Ex. 7 at 3–13; Pet'r's Ex. 8 at 179–97; Pet'r's Ex. 8,

Vol. II at 828–29; *see generally* Pet'r's Ex. 11. Petitioner received the subject flu vaccine in his left deltoid from a Walgreens Pharmacy Clinic on October 16, 2017.[2] Pet'r's Ex. 1 at 6.

Two days later, on October 18, 2017, Petitioner presented to chiropractor Daniel Benko, D.C., with a primary report of neck pain, in addition to pain in his upper back and left shoulder since he woke up that morning. Pet'r's Ex. 2 at 2. He rated his pain level a 7/10 and reported "no contributing factors." *Id.* On examination Dr. Benko described Petitioner's left shoulder and upper back muscles as "spastic in nature." *Id.* at 3. Dr. Benko observed limited range of motion at C5, and T2 had tight and tender fibers, "muscle spasms, and ha[d] subluxation on the left with moderately severe indications." *Id.* at 4. Petitioner also exhibited tenderness to palpitation in his upper trapezius, levator scapulae, and rhomboids. *Id.* Testing and X-rays of Petitioner's cervical and thoracic spine were negative. *Id.* Dr. Benko listed Petitioner's diagnoses as cervicalgia, pain in the thoracic spine, pain in the left shoulder, and "[m]yositis,[3] unspecified." The plan was for Petitioner to receive chiropractic treatment three times per week for six weeks, subject to the nature of his symptoms. *Id.*

The following day, on October 19, 2017, Petitioner presented to an urgent care facility with complaints of left shoulder pain that radiated to his shoulder blade or left side of his neck "since yesterday." Pet'r's Ex. 3 at 4. He could not move his shoulder "without any significant pain" and did not report a cause of the injury. *Id.* He denied back pain. *Id.* at 5. On examination Petitioner displayed severe tenderness over the muscles in his left trapezius, left rotator cuff, and left shoulder. *Id.* at 6. No tenderness was found in his left upper arm, left deltoid, or left biceps, and he displayed normal range of motion in his neck. *Id.* Petitioner was given a Toradol injection for the pain and sent home. *Id.* at 7.

Petitioner checked himself into the emergency department ("ED") at Franciscan Health the morning of October 20, 2017, with complaints of left shoulder pain. Pet'r's Ex. 4 at 3. He stated that he received the flu shot on "Monday," October 16, 2017, and that his "pain ha[d] gradually increased since then." *Id.* Petitioner reported that his pain started in his shoulder "and ha[d] since moved up into his neck and [was] painful to swallow," and described it as nerve pain. *Id.* at 11. Petitioner denied any other symptoms. *Id.* at 12. On examination Petitioner displayed left neck tenderness and pain in his left shoulder when his arm was fully extended. *Id.* at 13. At a later encounter during his hospitalization, another provider noted that Petitioner presented with chest wall pain that had been present since his flu shot. *Id.* at 24.

Labs revealed elevated D-dimer, C-reactive protein ("CRP"), glucose, and neutrophil levels and low platelet levels. Pet'r's Ex. 4 at 15–17. A pulmonary computed tomography ("CT") scan was performed and found no pulmonary embolism, though a cystic focus was identified on the left glenoid that "could represent a para labral cyst or synovial cyst." *Id.* at 16–17. Magnetic

[2] The informed consent form Petitioner completed prior to vaccination is dated as October 16, 2017, by both Petitioner and the vaccine administrator. Pet'r's Ex. 1 at 7. It was noted that the form was given to Petitioner on October 16, 2017. *Id.* at 6–7. However, Walgreens billing records indicate that the vaccination date was October 17, 2017. *Id.* at 2, 5.

[3] Myositis is "inflammation of a voluntary muscle." *Myositis*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=32923&searchterm=myositis (hereinafter, "DORLAND'S").

resonance imaging ("MRI") was recommended. *Id.* at 17. A chest X-ray was normal. *Id.* Due to the hospital's MRI machine being temporarily inoperable and a consideration of possible fasciitis,[4] Petitioner was admitted for further observation by Michael Todd, D.O. *Id.* at 19. His diagnoses at the time of admission were "[a]cute chest wall pain," "[a]dverse reaction to vaccine, initial encounter," "CRP elevated," and "nontraumatic shoulder pain, left." *Id.* at 20.

After admission, Petitioner was started on a course of antibiotics for possible cellulitis.[5] Pet'r's Ex. 4 at 21. An MRI of his left shoulder was performed, which revealed a torn inferior labrum, "a large multiseptated para labral cyst along the anterior inferior aspect of the glenoid," and an edema[6] within the lateral head of the deltoid "likely related to recent flu vaccination without focal fluid collection." *Id.* at 41. The MRI also found "prominent edematous infiltration of the chest wall superiorly and anteriorly extending in to the base of the neck." *Id.* It was noted that an infectious or inflammatory process could not be excluded, and additional MRIs of the neck and brachial plexus were recommended. *Id.* However, another provider interpreted these results differently, noting a "possible old rotator cuff injury with small cyst" and "non-specific" findings in his soft tissue. *Id.* at 21.

Orthopedic surgeon John Guzzo met with Petitioner for a consultation on October 21, 2017. Pet'r's Ex. 5 at 4. Dr. Guzzo observed tenderness along the left sign of his neck and scapula, and noted Petitioner had full range of motion, though he experienced pain past 150 degrees and had a "painful O'Brien's test." *Id.* at 5. Dr. Guzzo opined that his left shoulder MRI revealed no rotator cuff tear, but identified a labrum tear. *Id.* He also opined that the para labral cyst was likely "an incidental finding and definitely not the cause or source of the patient's pain and symptoms. . . . [They] have most likely been there for months to years where the symptoms just started over the past several days after this vaccination." *Id.* Dr. Guzzo believed Petitioner suffered from "a possible case of brachial plexitis[7] . . ." and recommended a neurology consult for an electromyograph ("EMG") and nerve conduction study ("NCS"). *Id.* He also recommended further MRIs of Petitioner's neck and brachial plexus. *Id.*

Petitioner's neurology consultation was performed by neurologist Lonnie Amico on October 21, 2017. Pet'r's Ex. 6 at 3. Petitioner reported the onset of his shoulder pain as occurring "several days" after his flu shot, which also included neck pain and difficulty swallowing. *Id.* Petitioner's neurological examination was normal and Dr. Amico noted Petitioner had tenderness at the peak of his shoulder. *Id.* at 4. After reviewing Petitioner's labs and imaging, Dr. Amico opined that Petitioner suffered from "localized fasciitis and dysfunction of the left upper

---

[4] Fasciitis is "inflammation of the fascia." *Fasciitis*, DORLAND'S. Fascia is "a sheet or band of fibrous tissue that forms an investment for muscles and various other organs of the body, part of the lining of the walls of body cavities, a ligament supporting a visceral organ, or a neurovascular sheath." *Fascia*, DORLAND'S.

[5] Cellulitis is "an acute, diffuse, spreading, edematous, suppurative inflammation of the dep subcutaneous tissues and sometimes muscle, sometimes with abscess formation." *Cellulitis*, DORLAND'S.

[6] An edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues. It may be localized (as from venous obstruction, lymphatic obstruction, or increased vascular permeability) or systemic (as from heart failure or renal disease). *Edema*, DORLAND'S.

[7] Brachial plexopathy is "any neuropathy of the brachial plexus." *Brachial Plexopathy*, DORLAND'S.

extremity" and ruled out consideration of brachial plexopathy and Parsonage Turner syndrome.[8] *Id.* Dr. Amico declined to perform an EMG, but requested further MRI imaging of Petitioner's neck and brachial plexus. *Id.*

Petitioner's cervical spine MRI was unremarkable. Pet'r's Ex. 4 at 42. The MRI of Petitioner's neck revealed a nonspecific edema on the left side of his neck and "visualized anterior chest wall soft tissues without focal fluid collection." *Id.* at 43. The MRI of Petitioner's chest and brachial plexus revealed "[d]eep subcutaneous and interfascial edema about the base of the neck on the left as well as the chest wall as described extending along a portion of the brachial plexus." *Id.* at 44. Inflammation and infection could not be excluded without evidence of an abscess. *Id.* By October 22, 2017, Petitioner's pain had improved with 90% range of motion, and he was discharged home on oral Prednisone and Norco. *Id.* at 21–22. He was advised to follow up with his primary care provider ("PCP") as soon as possible. *Id.* at 22.

On October 31, 2017, Petitioner presented to his PCP, William Will, where he reported that he suffered an adverse reaction to the flu vaccine that resulted in the swelling of his left arm, "pressing on his brachial plexus and he [had] a brachial plexus injury." Pet'r's Ex. 7 at 14. Cardiac injury was ruled out. *Id.* On examination Petitioner reported weakness in his left upper arm and shoulder and Dr. Will observed limited range of motion when lifting his arm. *Id.* at 15. Dr. Will advised Petitioner to continue treatment with the doctors that saw him at the hospital and informed Petitioner he "could contact the adverse vaccine reporting system [("VAERS")]." *Id.* No VAERS report was filed in the record.

Petitioner contacted his chiropractor on November 1, 2017, to request a copy of his X-ray images. Pet'r's Ex. 2 at 7. He stated that "he went to urgent care and the physician at urgent care said that he had nerve damage due to a flu shot." *Id.*

On November 2, 2017, Petitioner presented to the urgent care at the Jesse Brown Veterans Affairs Medical Clinic ("VA Clinic"), where he was seen by Dr. Pavlos Kaimakliotis. Pet'r's Ex. 8, Vol. II at 418. He reported receiving the flu shot on October 16, 2017, resulting in shoulder pain that "began to be associated with weakness in [left] shoulder, severe shooting pain, radiating to the [left] anterior neck and down the shoulder." *Id.* He reported that Prednisone had helped alleviate his pain, but the pain returned when he finished his prescription. *Id.* He rated his current pain as "severe," and that he had tried to set up neurology appointments at the hospital but was unsuccessful. *Id.* On examination Petitioner displayed reduced range of motion in his left shoulder and had reduced sensation "over C4/5/6 dermatomes in comparison to [right] upper extremity." *Id.* at 419. Dr. Kaimakliotis' differential diagnosis was "SIRVA . . . vs nerve damage from intramuscular needle." *Id.* at 420. X-rays and labs were ordered, Petitioner's Prednisone was restarted, and a neurology consultation was scheduled. *Id.*

Frustrated that he could not schedule a neurology appointment until early December, Petitioner presented to the VA Clinic ED on November 6, 2017. Pet'r's Ex. 8, Vol. II at 410. A neurology consultation was conducted by neurologist Jacqueline Hirsch, where Petitioner reported the onset of his pain as two days after receiving the flu vaccine. *Id.* at 412. Petitioner "cite[d] pain

---

[8] Parsonage Turner Syndrome, also called neuralgic amyotrophy, is "pain across the shoulder and upper arm, with atrophy and paralysis of the muscles of the pectoral girdle." *Neuralgic Amyotrophy*, DORLAND'S.

in the scapular region, in his pectoralis, but not in his deltoid," though he did describe numbness in his deltoid. *Id.* On examination Petitioner displayed reduced range of motion and decreased sensation on his deltoid and scapular region. *Id.* at 413. Dr. Hirsch opined that Petitioner's decreased sensation covered several dermatomes and thus was "unlikely the result of an injection injury." *Id.* After a literature search, Dr. Hirsch opined that either SIRVA or "vaccine-induced adhesive capuslitis (sic)"[9] where possible explanations of his symptoms. *Id.* She opined there was no neurological etiology associated with his condition and advised he consult with orthopedics for examination of potential adhesive capsulitis and his para labral cyst. *Id.* The attending neurologist, Stuart Perlik, later added an addendum to Dr. Hirsch's note that disqualified an autoimmune or inflammatory brachial plexopathy and mono-neuritis multiplex as potential diagnoses. *Id.* at 415. Dr. Perlik noted the possibility of adhesive capsulitis vs autoimmune synovial phenomena and opined that "radiographic features appear suggestive or compatible with the second consideration." *Id.* Petitioner was instructed to follow up with his PCP next week. *Id.* at 411

Petitioner returned to Dr. Amico at Franciscan Health on November 10, 2017, with continued complaints of "neck pain, neck stiffness, muscle weakness, and muscle twitching," since his last presentation. Pet'r's Ex. 6 at 5. His physical examination revealed weakness in his deltoid, supraspinatus, and triceps. *Id.* at 8. Dr. Amico's assessment was fasciitis vs brachial neuritis, and she prescribed Petitioner to begin physical therapy ("PT"). *Id.* at 9.

Petitioner underwent an EMG/NCS on November 15, 2017, which found denervation changes in C5-C6 root distribution on the left, but no evidence of a peripheral neuropathy or plexopathy. Pet'r's Ex. 8, Vol. II at 389. Dr. Peter Hurh, who reviewed Petitioner's test results, opined that the findings would be consistent with the "significant muscle atrophy over the left supraspinatus, infraspinatus, and deltoid muscles." *Id.* "This would indicate pathology at that level, which is chronic in nature, as evidenced by the changes demonstrated during motor unit action potential analysis." *Id.*

Later that same day Petitioner presented to neurologist Douglas Juvinall for a consultation at the VA Clinic. Pet'r's Ex. 8, Vol. II at 390. He reported his pain as "in [his] left pectoralis, wraps above/around axilla, and up to back of neck/head." *Id.* at 390–91. He also reported weakness in his shoulder and elbow. *Id.* at 391. After reviewing Petitioner's imaging, test results, and conducting a physical examination, Dr. Juvinall opined that his presentation was consistent with "C5-C6 root, upper trunk, and lateral cord involvement of brachial plexus." *Id.* at 394. He stated the "most likely diagnosis is Parsonage-Turner [syndrome] of the left brachial plexus []. The insult is most likely the vaccination which is a known cause of this condition." *Id.* Petitioner was instructed to schedule a consultation to start intravenous immunoglobulin ("IVIG"). *Id.*

Petitioner presented to neurologist Qin Jiang to discuss starting IVIG therapy on November 21, 2017. Pet'r's Ex. 11 at 3. Petitioner reported that the pain in his shoulder began "almost immediately after [the] flu shot." *Id.* Petitioner reported consistent pain at the time of examination, which prompted Dr. Jiang to order a repeat EMG, but found no new findings. *Id.* at 2. The same day, Petitioner presented to neurologist Aftab Awan for further examination. Pet'r's Ex. 8, Vol. II

[9] Adhesive capsulitis is "adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by shoulder pain of gradual onset, with increasing pain, stiffness, and limitation of motion." *Adhesive Capsulitis*, DORLAND'S.

at 379. Dr. Awan repeated Petitioner's medical history and noted that myocarditis and cardiac disease was ruled out during his hospitalization. *Id.* at 380. He noted that the cause of Petitioner's shoulder pain was "unclear . . . though it started post flu vaccine." *Id.* at 384. Dr. Awan recommended Petitioner undergo additional MRIs of his cervical cord and left brachial plexus. *Id.* His differential diagnosis was "CRPS." *Id.* Dr. Jiang added an addendum to Dr. Awan's note opining that Petitioner's clinical picture was inconsistent for Parsonage Turner syndrome. *Id.* She explained that literature identified instances of vaccines causing adhesive capsulitis and subacromial bursitis,[10] and recommended Petitioner be admitted for faster treatment. *Id.*

On November 27, 2017, Petitioner was admitted to the VA hospital for expedited workup of his left shoulder pain. Pet'r's Ex. 8, Vol. II at 373. In addition to his other symptoms, during his admission Petitioner reported experiencing swelling of his cheek and neck at night, as well as the presence of "pimples" across his neck, left arm, and back. *Id.* He stated that he was in "constant, excruciating pain" and that he was taking Xanax to sleep at night. *Id.* At admission his differential diagnosis was "post-vaccination adhesive capsulitis, subacromial bursitis, synovial inflammation secondary to inadvertent injection into synovial tissue, less likely brachial neuritis given no plexopathy on NCS/EMG." *Id.* at 374.

Later that day neurologist Bayan Moustafa conducted a neurology examination with Petitioner. Pet'r's Ex. 8, Vol. II at 318. Petitioner displayed slight weakness in his left deltoid, biceps, and triceps. *Id.* at 320. Dr. Moustafa also noted "notable swelling in the [left] anterior chest with tenderness, pain on passive and active motion of the [left] shoulder," and weakness in his deltoid, biceps, and triceps. *Id.* at 321. Dr. Moustafa reiterated the possibility of adhesive capsulitis or subacromial bursitis from the flu vaccine, and suggested further workup to investigate. *Id.* Dr. Jiang visited Petitioner for a follow-up the next day on November 28, 2017, and opined that there was insufficient evidence of Parsonage Turner syndrome. *Id.* at 322. Dr. Jiang recommended "aggressive PT and pain control." *Id.*

Petitioner also completed a pain management consultation while hospitalized with Dr. Jacob Heninger. Pet'r's Ex. 8, Vol. II at 308. Dr. Heninger observed weakness in the deltoid during his examination and noted a possible diagnosis of brachial plexus neuritis, though he opined that the negative EMG "could be from progression of time and steroids." *Id.* at 310. He prescribed Petitioner with PT, gabapentin, and advised Petitioner to "avoid injection of [glenohumeral] joint given unlikely to be cause of pain." *Id.* Following this appointment Petitioner was again seen by Dr. Moustafa and Dr. Jiang, who had since reviewed his prior MRI images. *Id.* at 307. Dr. Moustafa opined that his labrum tear and cyst "could be compressing the suprascapular nerve." *Id.* He also observed mild focal swelling of Petitioner's deltoid. *Id.* He thus opined that Petitioner's symptoms were "unlikely due to an obvious neurological injury," and repeated his belief that Petitioner suffered from either adhesive capsulitis or bursitis from the flu vaccine. *Id.*

Another consultation with Dr. Moustafa was performed on November 29, 2017. Pet'r's Ex. 8, Vol. II at 291. Petitioner stated that he was doing better and that ibuprofen was improving his pain and range of motion. *Id.* A repeat MRI of his chest and shoulder conducted on November 28, 2017, "continue[d] to show the soft tissue swelling in the anterior chest wall and within trapezius

[10] Bursitis is "inflammation of the bursa, occasionally accompanied by a calcific deposit in the underlying tendon." *Bursitis*, DORLAND'S.

and supraspinatus muscles; rotator cuff tendinosis; paralabral cyst with suspected anterior inferior labral tear." *Id.* Dr. Jiang further noted that although there were no findings consistent with brachial plexopathy or Parsonage Turner syndrome, "the etiology of the MRI and laboratory findings are difficult to explain." *Id.* She noted that "[a]n asymmetric viral myositis may be the case which should be self-limited," and recommended an autoimmune workup be conducted due to Petitioner's consistently elevated erythrocyte sedimentation rate ("ESR") and CRP. *Id.* At this point neurology stopped following Petitioner as a patient due to a lack of neurological etiology. *Id.*

Later that day Petitioner completed a consultation with rehabilitation specialist Ross Coolidge. Pet'r's Ex. 8, Vol. II at 280. Petitioner reported that he experienced swelling, pain, and weakness "in his left sternum/chest and upper extremity starting the follow[ing] day" after receiving the flu vaccine. *Id.* at 281. He now reported associated numbness on his left sternum/chest and left upper arm. *Id.* Dr. Coolidge reviewed Petitioner's MRIs taken the day prior, which showed a "[s]of tissue edema superficial to the deltoid muscle [that] may represent[] residual of prior flu vaccine." *Id.* at 283. The MRIs also showed edemas that could not be explained by the vaccine in his trapezius and supraspinatus musculature, as well as an "[a]bnormal appearance of the anterior left chest wall musculature" around Petitioner's left pectoralis and left clavicle, which was concerning for a muscle strain injury. *Id.* at 283–84. Dr. Coolidge also opined that the edemas in Petitioner's trapezius and supraspinatus musculature may be related to his chest wall injury. *Id.* at 284. He recommended Petitioner begin PT, continue gabapentin and ibuprofen, and consider a subacromial steroid injection if his symptoms did not improve. *Id.*

Also that day, Petitioner completed a consultation with rheumatologist Ozair Ziauddin. Pet'r's Ex. 8, Vol. II at 273. Petitioner reported that his left deltoid became sore after receiving the flu vaccine, which became worse over the next two days. *Id.* He described his pain as "a drilling sensation of his left scapula that radiates to the left neck and wraps around the deltoid to the left anterior chest." *Id.* at 274. He also reported pain in his right shoulder due to compensating for the pain in his left shoulder. *Id.* On examination Dr. Ziauddin observed swelling and edema "overlying the proximal clavicle-manubrial region with overlying hyperpigmentation." *Id.* at 275. Petitioner displayed reduced range of motion due to pain. *Id.* Dr. Ziauddin also noted Petitioner's acne on his back and chest that primarily affected his left side. *Id.* Due to Petitioner's increased ESR levels, Dr. Ziauddin's differential diagnosis was hypersensitivity to the flu vaccine vs infectious myositis, though he noted that a hypersensitivity reaction may be less likely due to the length of Petitioner's symptoms. *Id.* at 276. He noted that there were no signs of a rheumatic process as Petitioner's symptoms were localized to his shoulder. *Id.* Dr. Ziauddin recommended rechecking Petitioner's creatine kinase ("CK") level and conducting a muscle biopsy for further evaluation. *Id.* The biopsy was performed on December 1, 2017. *Id.* at 234. Petitioner's CK levels were normal. *Id.* at 233. Following the biopsy Petitioner was considered stable and discharged. *Id.*

On December 15, 2017, Petitioner returned for a follow-up appointment with Dr. Jiang. Pet'r's Ex. 8, Vol. II at 220. The preliminary conclusion of Petitioner's biopsy was "a focal myositis of unclear etiology." *Id.* Petitioner reported continued pain and range of motion and that the rash on his chest and back "ha[d] been present since the onset of pain and weakness." *Id.* Dr. Jiang ordered autoimmune labs and made referrals to dermatology and rheumatology for continued workup. *Id.* at 222.

Petitioner began his PT on December 21, 2017. Pet'r's Ex. 8, Vol. II at 91. Petitioner told his PT specialist that he has "bad pain, limitation in movement and atrophy at [his] left shoulder followed by a flu shot." *Id.* at 92. The specialist documented visible atrophy at the left deltoid and supraspinatus muscle. *Id.* at 93. Petitioner tolerated PT well and was scheduled to complete PT one to two times per week for eight weeks. *Id.* at 94. Petitioner attended eight PT sessions between December 21, 2017, and April 6, 2018. *Id.* at 188–202. On February 16, 2018, Petitioner reported no pain in his left shoulder and improved range of motion. *Id.* at 196. At the time of Petitioner's discharge from PT on April 6, 2018, he had nearly restored his range of motion and experienced residual pain when walking. *Id.* at 202.

Petitioner's muscle biopsy report was completed on December 26, 2017. Pet'r's Ex. 8, Vol. II at 202. The report provided the following description:

> This skeletal muscle biopsy shows significant muscle damage and fibrotic remodeling as well as prominent inflammatory cell infiltrates as described in detail below.[] The changes are non[-]specific for certain disease processes. No purulent inflammation is seen but the possibility of an infectious process is not entirely excluded based on the biopsy findings and also has to be addressed clinically. Overall though, the biopsy findings and the clinical context could fit for a presentation that has been described as "focal myositis."

*Id.* at 202–03. A later addendum to Petitioner's biopsy results further noted that immunohistochemical staining was performed for IgG and IgG4 related disease, which was found to "not clearly suggest this type of diagnosis. The diagnosis therefore remains unchanged." *Id.* at 475.

On March 1, 2018, Petitioner returned to Dr. Juvinall for a neurology follow-up. Pet'r's Ex. 8, Vol. II at 190. Dr. Juvinall observed that Petitioner presented "with marked improved strength" and occasional residual pain in his left axilla. *Id.* at 191. Petitioner also reported an ulnar paresthesia on his left hand and denied chest pain. *Id.* On examination Dr. Juvinall observed only mild atrophy of the left deltoid and improved motor functions on his left arm and shoulder. *Id.* at 192. Petitioner also had mildly reduced sharp sensation in the nerves throughout his left arm. *Id.* at 193. Dr. Juvinall continued to opine that Petitioner likely had an "injury [to the] C5-C6 root, upper trunk, and lateral cord involvement of brachial plexus given weakness of deltoid, biceps, triceps, [and] pectoralis," Petitioner's decreased reflexes, and his sensory pattern. *Id.* at 195. However, Dr. Juvinall noted that Parsonage-Turner syndrome would not cause myositis and that a myositis or musculoskeletal injury would not lead to his muscle atrophy and other neurologic symptoms. *Id.* "Still likely to have had inflammation of nerves in brachial plexus that is now improving with aggressive therapy." *Id.* Dr. Juvinall referred Petitioner back to rheumatology for another opinion regarding his myositis. *Id.*

Petitioner presented to rheumatologist Chase Corriea on April 4, 2018, to further discuss his myositis diagnosis. Pet'r's Ex. 8, Vol. II at 71. Petitioner reported to Dr. Corriea that his pain began "[w]ithin a few days" of receiving the flu vaccine and "rapidly developed to complete paralysis of the [left] arm with numbness in the lateral arm." *Id.* at 72. Dr. Corriea opined that

> [g]iven the lack of bilateral symptoms, presence of pain, and normal CK, there is no concern for polymoyisits (sic) or dermatomyositis. Given initiation from flu shot, definitely possible that an infectious or inflammatory process could have caused the neurologic and muscular symptoms and lab findings. He clearly had a severe reaction to the flu shot, whatever the cause.

*Id.* at 76. Due to the improvement of Petitioner's symptoms and lack of signs for an autoimmune process, Dr. Corriea stated that he was less concerned for a persistent myositis. *Id.* He ordered further labs and noted that he would adjust Petitioner's treatment plan based on the results. *Id.* Petitioner's bloodwork was normal apart from elevated eosinophils. *Id.*

On July 31, 2018, Petitioner returned to the VA clinic and was seen by rheumatologist Sarah Fantus. Pet'r's Ex. I, Vol. II at 173. Dr. Fantus noted that due to Petitioner's normal labs and localized nature of his symptoms, it was "thought to have been a reaction to [the] flu shot without a systemic myositis." *Id.* at 174. Petitioner reported improved pain and strength, though he still exhibited some weakness on his left side numbness on the left ulnar surface. *Id.* Dr. Fantus assessed Petitioner's condition to be a "severe local inflammatory reaction after getting [the] flu shot into left deltoid with muscle and nerve involvement" with a low suspicion for persistent myositis. *Id.* at 177. She recommended Petitioner follow up with neurology and return to the rheumatology clinic as needed. *Id.*

Petitioner returned to the VA Clinic on August 13, 2018, for a visit with his new PCP, Carl Weirsema-Doorn. Pet'r's Ex. 8, Vol. II at 169. Petitioner reported that he continued to have left arm weakness and numbness and was experiencing right shoulder pain due to compensating for his left shoulder. *Id.* An X-ray of Petitioner's right shoulder was performed which revealed mild subluxation at the acromioclavicular joint that may be secondary to an acromioclavicular joint sprain. *Id.* at 171–172. Petitioner was instructed to follow up with neurology and orthopedics. *Id.* at 166, 171.

Petitioner presented for his orthopedic consultation on September 14, 2018, and was seen by Dr. Brian Fruin. Pet'r's Ex. 8, Vol. II at 165. Petitioner reported a prior arthroscopic surgery on his right shoulder while serving in the Navy, which resulted in "right shoulder winging ever since." *Id.* Petitioner's right shoulder pain was now worse than his left shoulder pain with overhead reaching. *Id.* An MRI of Petitioner's right shoulder was ordered and Petitioner was given instructions for rotator cuff strengthening. *Id.* at 166.

On June 24, 2019, Petitioner returned to his PCP for an annual examination. Pet'r's Ex. 8, Vol. II at 159. He denied any chest pain but reported bilateral shoulder pain and left ulnar numbness. *Id.* at 160. On examination Petitioner displayed full range of motion and strength in both arms. *Id.* at 161.

No other medical records were filed.

## III. Petitioner's Affidavit

On May 4, 2020, Petitioner filed his affidavit. Pet'r's Ex. 9, ECF No. 12. Petitioner stated that when he received the vaccine he felt "the area in which [he] was injected seemed too high on [his] left arm." *Id.* at ¶ 3. He stated that he was in a seated position and the vaccine administrator was in a standing position. *Id.* Over the next two days he began to experience "shooting pain and tingling nerve pain" in his left arm, which started on the left side of his neck and "radiat[ed] down [his] left shoulder." *Id.* at ¶ 5. The pain was worse with movement and Petitioner also began to experience weakness in his left arm and hand. *Id.* The day after he received the flu vaccine, on October 18, 2017, he "woke up with left sided neck pain, upper back pain, and pain in [his] left shoulder, arm, and hand," prompting a visit to his chiropractor. *Id.* at ¶ 6.

The next day, on October 19, 2017, Petitioner was unable to move his shoulder without significant pain, which led him to visit an urgent care facility where he received a shoulder injection. Pet'r's Ex. 9 at ¶ 7. He presented to the ED the following day due to persistent pain and a new onset of difficulty swallowing. *Id.* at ¶ 8. At this visit Petitioner was "informed that [his] condition was caused by an adverse reaction to the [flu] vaccine." *Id.* His diagnoses at discharge were "chest wall pain and adverse reaction to vaccine." *Id.* at ¶ 9. At his later visit with his PCP, Petitioner continued to suffer from decreased range of motion and left shoulder pain, and now had swelling that was "causing a brachial plexus injury." *Id.* at ¶ 10. Petitioner's PCP informed him about the adverse effects of vaccines and "told [him he] could contact the adverse vaccine reporting system." *Id.*

Petitioner then presented to the VA Clinic on November 2, 2017, after his Prednisone had worn off and his symptoms became severe again. Pet'r's Ex. 9 at ¶ 11. At his subsequent neurology consultation on November 6, 2017, Petitioner was told that his symptoms were either related to a SIRVA or a "vaccine-induced adhesive capsulitis." *Id.* at ¶ 12. Petitioner further detailed issues of shoulder pain, neck pain, and numbness along his left arm at his subsequent visits before his November 2017 hospitalization, including "feeling like [his] brain needed to catch up" when he turned his head rapidly. *Id.* at ¶¶ 13–17. During his hospitalization Petitioner reported that he "described to [his] medical providers that [his] pain started almost immediately after getting the flu shot." *Id.* at ¶ 17. Following his discharge Petitioner participated in PT until April 6, 2018, when he had improved the strength and range of motion in his shoulder, but "continu[ed] to experience some pain" and swelling in his left shoulder. *Id.* at ¶¶ 18–19. Petitioner eventually developed weakness and numbness in his left arm and pinky, as well as pain in his right shoulder due to compensating for his left side, which he reported to his PCP. *Id.* at ¶ 20. Petitioner stated that he had previously injured his right shoulder when securing an ammunition cache while serving in the Navy. *Id.* at ¶ 21.

Petitioner continues to suffer "pain and disability" in his left shoulder and "anticipate[s] that [he] will need to seek further treatment for [his] injury, including muscular neuropathy for [his] neck and shoulder." Pet'r's Ex. 9 at ¶¶ 22–23. He also stated that from November 2017 to January 2018 he "had no motion in [his] left shoulder at all." *Id.* at ¶ 28.

## IV. Expert Reports

### A. Expert Qualifications

#### 1. Petitioner's Expert, Dr. Uma Srikumaran, M.D.

Petitioner did not file a CV for Dr. Srikumaran. According to the qualifications section of Dr. Srikumaran's report, he is a board-certified orthopedic surgeon who currently serves as an Associate Professor in the Shoulder Division of Johns Hopkins School of Medicine. Pet'r's Ex. 12 at 1. He "was trained in medicine and orthopaedic surgery at the Johns Hopkins School of medicine and specifically as a shoulder specialist at Harvard." *Id.* In Dr. Srikumaran's current role, he is responsible for both teaching and research, and he has "published numerous articles in the field of shoulder surgery," including two related to SIRVA injuries. *Id.* He has treated 10 to 12 patients with shoulder dysfunction after vaccination within the past five years, and sees between 2,500 and 3,000 patients with shoulder issues each year. *Id.*

#### 2. Respondent's Expert, Dr. Geoffrey Abrams, M.D.

Dr. Abrams is a board-certified orthopedic surgeon who currently serves as an Associate Professor of Orthopedic Surgery at the Stanford University School of Medicine, the Director of Sports Medicine for Stanford University Varsity Athletics, and as a Team Physician for the San Francisco 49ers. Resp't's Ex. A at 1; Resp't's Ex. B at 1. He received his M.D. from the University of California, San Diego, and he completed his medical internship and orthopedic surgery residency at Stanford University Hospital. Resp't's Ex. B at 1–2. He also completed a fellowship in orthopedic sports medicine at Rush University Medical Center. *Id.* at 1. Dr. Abrams' practice currently focuses on orthopedic conditions of the shoulder, and he has published over 130 peer reviewed publications related to the shoulder and other musculoskeletal pathologies. Resp't's Ex. A at 1.

### B. Expert Reports

#### 1. Dr. Srikumaran's Initial Report

##### a. Table SIRVA Claim

Dr. Srikumaran began the analysis of his report by first stating Petitioner satisfied the qualifications and aids to interpretation ("QIAs") required to succeed on a Table SIRVA claim. Pet'r's Ex. 12 at 8. However, Dr. Srikumaran then provided the caveat that Petitioner's "pain and symptoms do not follow the typical presentation of most SIRVA cases" due to other areas of reported pain and dysfunction throughout his course of treatment. *Id.* at 9.

Dr. Srikumaran explained that despite the varying areas of pain and dysfunction Petitioner experienced, he agreed with Petitioner's treaters that he did not suffer from Parsonage Turner syndrome or cervical radiculopathy. Pet'r's Ex. 12 at 9–11. He also observed that studies had found patients presenting with neck pain may produce "proactive shoulder test results," and vice versa, due to "muscular spasm or dysfunction of the numerous muscles that connect the shoulder and neck" such as the trapezius, pectoralis, and levator scapulae muscles. *Id.* at 11. (citing Pet'r's Ex.

12, Tab 10).[11] Gorski & Schwartz conducted a study of 34 patients to determine whether impingement syndrome of the shoulder displayed as chronic neck pain near the "junction at the base of the neck and the upper back." Pet'r's Ex. 12, Tab 10 at 1–2. Much of the authors' discussion focused on shoulder injuries that presented without shoulder pain, but instead resulted in referred pain to the neck. *Id.* at 2 The authors also noted that "[n]eck pain may also result from a protective mechanism [towards the shoulder injury] causing muscle overload and spasm of adjoining muscles and tendons." *Id.* This protective mechanism resulting in muscle overload and spasm is what Dr. Srikumaran used to explain Petitioner's neck pain following his injury. Pet'r's Ex. 12 at 11.

To identify a specific shoulder pathology, Dr. Srikumaran pointed to Petitioner exhibiting symptoms specific to a shoulder injury: "pain with arm motions away from the body . . . , tenderness about the shoulder[], decreased range of motion, [and a] positive empty can (Jobe) test." Pet'r's Ex. 12 at 11 (citing Pet'r's Ex. 3 at 4; Pet'r's Ex. 8, Vol. II at 491, 454). Dr. Srikumaran also stated that Petitioner's pain "originated in his shoulder prior to moving to other areas," arguing that Petitioner's medical records indicated that his pain started in his shoulder before moving to his chest and neck. *Id.* at 11–12. To explain Petitioner's pain outside of his shoulder Dr. Srikumaran invoked the "kinetic chain principle." *Id.* at 12. The kinetic chain principle is described by Ellenbecker & Aoki[12] in their review article in the context of an overhead throwing athlete. Pet'r's Ex. 12, Tab 8 at 1. "[T]he human body can be considered in terms of a series of interrelated links or segments. Movement of one segment affects segments both proximal and distal to the first segment." *Id.* In the case of skill performance in the upper body, "work in the upper extremity segments is transmitted to the trunk and spine via a large musculoskeletal surface. There is an exchange of forces across this musculoskeletal surface, which results in the generation of massive amounts of energy," such as when a baseball player throws a pitch or a tennis player serves a ball. *Id.* at 2. This exchange occurs across a series of "links," which include the "trunk, scapulothoracic articulation, scapulohumeral or glenohumeral joins, and distal arm regions." *Id.* Each of these regions can be "considered independent anatomically and biomechanically, but with reference to human function must be considered a unit." *Id.*

Dr. Srikumaran cited to a series of articles he argued applied this principle in the context of referred hip pain to the knee, neck pain to the shoulder, and shoulder pain to the neck. Pet'r's Ex. 12 at 12 (citing Pet'r's Ex. 12, Tabs 11, 17, 20).[13] Applying this principle to Petitioner's case, Dr. Srikumaran opined that a shoulder injury could affect adjacent structures "such as the shoulder blade, cervical spine, pectoralis, [and] collar bone." *Id.* He provided the following sequence of events as a description of Petitioner's condition:

> [A] vaccination in the shoulder caused a robust immune-mediated inflammatory response. The pain in the shoulder caused compensation in the surrounding

[11] Jerrold M. Gorski & Lawrence H. Schwartz, *Shoulder Impingement Presenting as Neck Pain*, 85 J. BONE & JOINT SURGERY 635 (2003).
[12] Todd S. Ellenbecker & Ryoki Aoki, *Step by Step Guide to Understanding the Kinetic Chain Concept in the Overhead Athlete*, 13 CURRENT REVS. MUSCULOSKELETAL MED. 155 (2020).
[13] Richard J. Hawkins et al., *Cervical Spine and Shoulder Pain*, 258 CLINICAL ORTHOPAEDICS & RELATED RSCH. 142 (1990); Stephen G. Manifold & Peter D. McCann, *Cervical Radiculitis and Shoulder Disorders*, 368 CLINICAL ORTHOPAEDICS & RELATED RSCH. 105 (1999); Wenbao Wang et al., *Does Ipsilateral Knee Pain Improve After Hip Arthroplasty?*, 470 CLINICAL ORTHOPAEDICS & RELATED RSCH. 578 (2012).

> musculature, resulting in pain and inflammation in those areas as well. Throughout the record, and evidenced by imaging, [Petitioner] was found to have edema [], myositis [], and muscle strain in the left chest wall muscles including the pectoralis, clavicle, and sternum. All of these findings are indications of a musculoskeletal issue that can be explained by compensatory issues stemming from the shoulder and affecting adjacent areas of the kinetic chain.

*Id.* at 12–13. He further argued that there was no alternative diagnosis to support Petitioner's condition, specifically citing to Petitioner's physicians ruling out consideration of Parsonage Turner syndrome, brachial plexopathy, and cervical radiculopathy. *Id.* at 13. "A vaccination into the deltoid cannot cause a direct injury that would affect the anterior chest. That leaves us with a diagnosis of SIRVA in which the shoulder pain led to injures in the surrounding musculature and anatomic structures, resulting in the overall picture that we see in this case." *Id.*

**b. Causation-in-Fact Claim**

Dr. Srikumaran next addressed Petitioner's causation-in-fact claim, starting with his medical theory of causation. Pet'r's Ex. 12 at 13. He cited to Bodor & Montalvo[14] and Atanasoff et al.[15] as the first articles discussing the possibility of shoulder pathology via vaccine antigen injected into the subacromial bursa, which "led to a robust local immune and inflammatory response leading to pathology of the subacromial space, biceps tendon, glenohumeral joint, and capsulitis." *Id.* (citing Pet'r's Exs. 1, 4) (internal citations omitted). Dr. Srikumaran specifically took note of Bodor & Montalvo's discussion of a "high" injection point as presenting a higher risk of shoulder injury in the subacromial space. *Id.* He also cited to Arias et al.,[16] a review of case reports discussing shoulder injuries after vaccination, where the authors identified poor vaccination technique and high injection angles as common factors in the development of injuries such as subacromial bursitis. *Id.*; Pet'r's Ex. 12, Tab 2 at 5. Dr. Srikumaran also provided several articles discussing inflammatory and immune-mediated responses stemming from antigen injection, such as the development of arthritis in rabbits and adverse reactions to intra-articular flu antigen injection in humans, as evidence of the inflammatory effect that can result from the injection of an antigen. *Id.* (citing Pet'r's Ex. 12, Tabs 7, 19).[17]

To bolster his causation theory, Dr. Srikumaran explained that the antigen in the vaccine, and not the mere injection of a serum, was the cause of the inflammatory reaction in the shoulder joint. Pet'r's Ex. 12 at 16. He explained this in the context of lidocaine and plasma injections that are frequently injected into the subacromial space without the resulting injury. *Id.* He also cited to instances where corticosteroid injections following SIRVA injuries resolved symptoms within one month as "evidence that contributes to the prevailing theory [of an inflammatory response to

---

[14] Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007).
[15] S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010).
[16] L.H. Martin Arias et al., *Risk of Bursitis and Other Injuries and Dysfunctions of the Shoulder Following Vaccinations*, 35 VACCINE 4870 (2017).
[17] D. C. Dumonde & L. E. Glynn, *The Production of Arthritis in Rabbits by an Immunological Reaction to Fibrin*, 43 BRITISH J. EXPERIMENTAL PATHOLOGY 373 (1962); C. Trollmo et al., *Intra-Articular Immunization Induces Strong Systemic Immune Response in Humans*, 82 CLINICAL EXPERIMENTAL IMMUNOLOGY 384 (1990).

vaccine antigens] via the criteria of reversibility." *Id.* (citing Pet'r's Ex. 12, Tab 16).[18] He then cited to several studies discussing incidents of subacromial and subdeltoid bursitis following vaccination, which were influenced by several factors, including injection point, sex, and muscle mass. *Id.* at 17–22 (citing Pet'r's Ex. 12, Tabs 3, 12, 13, 15, 18).[19] Dr. Srikumaran also discussed Donners et al.,[20] which examined MRI findings in nine patients suffering from SIRVA. Pet'r's Ex. 12 at 22 (citing Pet'r's Ex. 12, Tab 6). The vast majority of patients showed bone defects from erosion at the greater tuberosity of the humerus and tendonitis of the infraspinatus muscle tendon. Pet'r's Ex. 12, Tab 6 at 3. The majority of patients also reported capsulitis, synovitis, and bone marrow edema of the humeral head. *Id.* Three patients showed evidence of glenohumeral joint effusion and only one patient showed inflammation of the subdeltoid bursa. *Id.* at 4.

With respect to the logical sequence of cause and effect, Dr. Srikumaran reiterated his prior statement and provided the following additional explanation: "the needle injection of vaccine antigen inadvertently near the bursa or rotator cuff tendon led to a strong immune mediated inflammatory reaction, causing (bursitis and tendinitis, shoulder pain) in [Petitioner's] case." Pet'r's Ex. 12 at 16.

Turning to the existence of an appropriate temporal relationship, Dr. Srikumaran argued that Arias et al. provided the "best evidence" for a timeframe of shoulder injuries following vaccination. Pet'r's Ex. 12 at 17 (citing Pet'r's Ex. 12, Tab 2). The authors analyzed 45 case reports of SIRVA injuries, with the majority of cases experiencing onset within 48 hours, though some experienced onset as far as two months after vaccination. Pet'r's Ex. 12, Tab 2 at 1–2. Dr. Srikumaran opined that a proximate temporal relationship was appropriate because "[t]he proximate temporal relationship is consistently reported by the [P]etitioner in the medical records as discussed above. This timing supports a causation with the vaccination as the trigger." *Id.*

**2. Dr. Abram's Initial Report**

Dr. Abrams began his analysis by stating that Petitioner's "overall clinical picture is entirely inconsistent with SIRVA." Resp't's Ex. A at 10. He grounded this assertion in the fact Petitioner exhibited symptoms beyond his shoulder, including "neck pain, chest pain in the pectoral area, difficulty swallowing, elevated heart rate, inflammatory markers, skin reaction on his neck and chest, and MRI findings of inflammation in the muscles of the pectoral and trapezius

---

[18] Christopher V. Macomb et al., *Treating SIRVA Early With Corticosteroid Injections: A Case Series*, 185 MILITARY MED. 298 (2020).

[19] Sumeet Batra & Bridget Page, *Shoulder Injury Related to Vaccine Administration: Case Series of an Emerging Occupational Health Concern*, 69 WORKPLACE HEALTH & SAFETY 68 (2021); Elisabeth M. Hesse et al., *Shoulder Injury Related to Vaccine Administration (SIRVA): Petitioner Claims to the National Vaccine Injury Compensation Program, 2010-2016*, 38 VACCINE 1076 (2020); Elisabeth M. Hesse et al., *Risk of Subdeltoid Bursitis After Influenza Vaccination: A Population-Based Cohort Study*, 173 ANNALS INTERNAL MED. 18 (2020); Julia R. Hirsiger et al., *Chronic Inflammation and Extracellular Matrix-Specific Autoimmunity Following Inadvertent Periarticular Influenza Vaccination*, 124 J. AUTOIMMUNITY 102714 (2021); Michael Shahbaz et al., *Shoulder Injury Related to Vaccine Administration (SIRVA): An Occupational Case Report*, 67 WORKPLACE HEALTH & SAFETY 501 (2019).

[20] Ricardo Donners et al., *Chronic Stage Magnetic Resonance Imaging Findings in Patients with Shoulder Injury Related to Vaccine Administration (SIRVA)*, 52 SKELETAL RADIOLOGY 1695 (2023).

muscles." *Id.* Dr. Abrams also argued that no objective evidence of SIRVA was found in Petitioner's shoulder MRIs. *Id.* SIRVA injuries, which are mediated by inflammation in the subacromial bursa, "by definition limits its clinical symptoms to the shoulder and immediately adjacent areas," and would not include "systemic" symptoms outside of the shoulder. *Id.*

Dr. Abrams argued that Dr. Srikumaran's own references of SIRVA disagreed with his argument, as these described SIRVA as being limited to the subacromial and intra-articular spaces in the shoulders. Resp't's Ex. A at 11. According to Dr. Abrams, "none of these findings are consistent with SIRVA," and he argued that Dr. Srikumaran did not provide a reliable explanation to show how a shoulder injury could result in all of these symptoms. *Id.* He explained that if Dr. Srikumaran's kinetic chain principle were true, "we would see a physical continuity of the inflammation on the MRI between the injection site and the chest wall, pectoral, and neck muscle areas," but this continuity did not exist. *Id.* Dr. Abrams also highlighted the radiologist's assessment that the edema present on Petitioner's shoulder was not related to the edemas on Petitioner's chest and trapezius. *Id.* (citing Pet'r's Ex. 4 at 41). Dr. Abrams also stated that compensation due to the injury was insufficient to cause such severe inflammation to lead to a diagnosis of focal myositis that was present on MRI findings and confirmed via biopsy. *Id.* at 12. He cast further doubt on this theory given that Petitioner was complaining of symptoms in his pectoral and neck areas within days of the start of his symptoms, which he argued would be "very unlikely to be due to compensation." *Id.* "When one additionally considers the fact that [P]etitioner was noted to have many months of elevated blood and total body inflammatory markers . . . and dermatological changes, it is impossible for simple muscle compensation to cause all of these systemic findings." *Id.*

Despite disagreeing with a diagnosis of SIRVA, Dr. Abrams did agree with Dr. Srikumaran that Petitioner did not suffer from Parsonage Turner syndrome, brachial neuritis, or cervical radiculopathy. Resp't's Ex. A at 10. Rather, Dr. Abrams argued that Petitioner's symptoms were wholly related to his focal myositis. *Id.* at 12. Dr. Abrams acknowledged that he was "not an expert in this condition," though he provided a review article that he argued "encompass[es] nearly all of the symptoms and findings experienced by [P]etitioner such as pain, rashes/skin changes, difficulty swallowing, cardiac abnormalities, muscle inflammation on MRI, and elevated inflammatory markers." *Id.* (citing Resp't's Ex. A, Tab 1).[21] The article, Malik et al., discussed the clinical approaches and management strategies for the four primary forms of idiopathic inflammatory myopathies: dermatomyositis, polymyositis, necrotizing autoimmune myopathy, and sporadic inclusion body myositis. Resp't's Ex. A, Tab 1 at 1. Few epidemiologic studies exist examining idiopathic inflammatory myopathies, but retrospective studies have found that dermatomyositis, polymyositis, and non-specific myositis are the most common presentations. *Id.* at 3. Dermatomyositis can present with either an acute or insidious onset of weakness "that is accompanied or preceded by a characteristic skin rash." *Id.* Difficulty performing motor functions is common, and although it "is usually painless, [] pain can be a significant feature with acute disease." *Id.* Other complications include dyspnea, dysphagia, congestive chart failure, and arrhythmia. *Id.* Features of the accompanying rash include "erythematous, photosensitive rash on the neck, back, and shoulders (shawl sign) []; Malar and facial erythema along with purplish discoloration of eyelids (heliotrope rash) that is often association with periorbital edema []; and

---

[21] Asma Malik et al., *Idiopathic Inflammatory Myopathies: Clinical Approach and Management*, 7 FRONTIERS NEUROLOGY 1 (2016).

erythematous lichenoid popular scaly rash over the knuckles (Gottron's papules)." *Id.* Rashes associated with the anterior chest are also possible, though less common. *Id.* There are also amyopathic variants (presenting without cutaneous manifestations and no muscle involvement) and adermatopathic variants (presenting without isolated myositis with the pathological findings of dermatomyositis on muscle biopsy). *Id.* Polymyositis is less common and is an exclusionary diagnosis, with its pathology affecting muscles and extra muscular organs. *Id.* at 4. Polymyositis presents with progressive neck and symmetric proximal limb weakness, which can develop over weeks or months. *Id.* Myalgias, tenderness, dysphagia, and myocarditis are common symptoms. *Id.* In assessing myositis conditions, CK levels are "the most sensitive measure;" 70–80% of dermatomyositis patients will have CK levels 50 times above baseline, while 20% will be normal; Polymyositis patients will have elevated levels of five to 50 times above baseline. *Id.* at 5. ESR and CRP are not reliable indicators for myositis diagnosis. *Id.* EMG studies on myositis patients "almost always [] shows irritable myopathic process." *Id.* at 6. MRI images after a few months of onset "may show muscle atrophy, fatty transformation, and chronic muscle damage." *Id.* Muscle biopsies are "the gold standard to make the diagnosis." *Id.*

Dr. Abrams explained that Petitioner's "constellation of symptoms" would indicate a systemic disease process instead of a local response to a vaccine antigen, "evident by the diffuse muscle edema (not in the vaccination site) . . . as well as the elevated inflammatory markers." Resp't's Ex. A at 12. Conversely, "SIRVA . . . does not cause myositis in distant locations from where a vaccine was administered." *Id.* Dr. Abrams concluded his report by stating that "[t]he causative factor of [P]etitioner's focal myositis and associated signs and symptoms is outside the areas of [his] expertise. However, it is simply not plausible, let alone more likely than not, that muscle 'compensation' from a vaccine administration . . . could cause the constellation of medication findings seen in [P]etitioner." *Id.* at 13.

### 3. Dr. Srikumaran's Supplemental Report

Dr. Srikumaran's supplemental report focused primarily on disputing Dr. Abram's argument regarding Petitioner's focal myositis diagnosis. Pet'r's Ex. 13 at 1. Dr. Srikumaran acknowledged that focal myositis "may present a viable diagnosis," but argued that it did not account for all of Petitioner's symptoms. *Id.* Specifically, Dr. Srikumaran highlighted Dr. Juvinall's note that "PTS would not typically cause myositis, but that myositis or musculoskeletal condition alone would not lead to atrophy, decreased reflexes or sensation changes in a nerve pattern." *Id.* (citing Pet'r's Ex. 8, Vol. II at 583). He also pointed to Dr. Correia's statement that polymyositis and dermatomyositis were ruled out due to a lack of bilateral symptoms, but "given initiation from flu shot, definitely possible that an infectious or inflammatory process could have caused the neurologic and muscular symptoms." *Id.* (citing Pet'r's Ex. 8, Vol. II at 464). Dr. Srikumaran thus concluded that "it is possible in this case that [Petitioner] suffered from both diagnoses," though he argued that focal myositis would not explain the tenderness in Petitioner's shoulder, reduced range of motion, or positive empty can test. *Id.* Dr. Srikumaran also argued that Petitioner's pain first began in his shoulder before other symptoms started, which supported a shoulder pathology. *Id.* "That is to say that [P]etitioner's shoulder symptoms were caused by the vaccination, and the pectoral and upper trapezius symptoms were caused by a possible myositis condition." *Id.* at 2.

#### 4. Dr. Abram's Supplemental Report

In his supplemental report Dr. Abrams clarified that while focal myositis may be an alternative diagnosis, "the initial and most salient point of [his] report is that the clinical symptoms and objective findings of [P]etitioner are outside of the shoulder area." Resp't's Ex. C at 1. He reiterated his doubt as to muscle compensation causing chest and neck swelling, as well as Petitioner's other symptoms. *Id.* Dr. Abrams also contested a dual diagnosis of SIRVA and focal myositis, as "[P]etitioner's initial complaints within a couple of days after the vaccination involve[d] areas outside the shoulder, such as the upper back and neck," and Petitioner complained of chest pain four days after vaccination. *Id.* (citing Pet'r's Ex. 2 at 2; Pet'r's Ex. 3 at 4). Finally, Dr. Abrams noted that Petitioner's MRI of his shoulder, taken soon after vaccination, showed "no objective findings such as subacromial bursitis, fluid around the rotator cuff tendons, nor bone marrow edema/inflammatory reaction within the bone." *Id.* at 2.

## V. Legal Standards

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Rooks v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322, N.2 (Fed. Cir. 2010). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 837 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53. (Fed. Cir. 1999)); *see also Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. *Shyface*, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the Vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider evidence presented by the [R]espondent in determining whether the [P]etitioner has

established a prima facie case." *Flores v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 157, 162–63 (2014); *see also Stone v. Sec'y of Health & Hum. Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also as to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); *Pafford*, 451 F.3d at 1358–59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

### A. Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding his claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.").

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng. v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them.").

### B. Causation

To receive compensation through the Program, Petitioner must prove either (1) that he suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that he suffered an injury that was actually caused by a vaccination. *See* §§ 11(c)(1), 13(a)(1)(A); *Capizzano*, 440 F.3d at 1319–20. Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface*, 165 F.3d at 1352–53).

Petitioner claims he suffered a SIRVA Table injury and claims in the alternative, that his injury was caused-in-fact by a vaccination. Under the Vaccine Table Qualifications and Aids to

Interpretation ("QAIs"), SIRVA is defined as "shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm." 42 C.F.R. § 100.3(c)(10). "These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction." *Id.*

A vaccine recipient shall only be considered to have suffered a SIRVA Table Injury if all of the following are met:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination finds, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. §§ 100.3(c)(10)(i)–(iv).

To prove an injury that was caused-in-fact by vaccination, Petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999).

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d

1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health

professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby*, 997 F.3d at 1383. While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VI. Analysis

### A. Diagnosis

The parties dispute the nature of Petitioner's injury, including diagnosis. In cases where diagnosis is contested, "special masters may find whether a preponderance of evidence supports any proposed diagnosis before evaluating whether a vaccine caused that illness." *Hibbard v. Sec'y of Health & Hum. Servs*, No. 07–446V, 2011 WL 1766033, at *6 (Fed. Cl. Spec. Mstr. April 12, 2011) (citing *Broekelschen v. Sec'y of Health & Hum. Servs.,* 618 F.3d 1339, 1345–46 (Fed. Cir. 2010)). For the following reasons, I find there is not preponderant evidence in the record to support a SIRVA or similar, off-Table shoulder injury. However, there is preponderant evidence to establish that Petitioner suffered from focal myositis involving his left shoulder, neck, trapezius muscle, and anterior chest wall. Petitioner's initial presentation to a medical provider two days after vaccination involved a primary complaint of neck pain that also involved his upper back and left shoulder–Petitioner notably exhibited reduced range of motion in his neck at this time. Petitioner's pain remained in the same locations per his reporting the next day at his urgent care presentation, though he then listed his shoulder as the primary focus of his pain. By October 20, 2017, four days after vaccination, Petitioner was exhibiting pain in his shoulder, neck, and anterior chest wall, as well as difficulty swallowing, and he described this progression as beginning in his shoulder before expanding outward to other adjacent areas. Notably, following a biopsy conducted in December of 2017 (two months post vaccination), Dr. Jiang noted that he "emailed Dr. Peter Pytel of neuropathology at University of Chicago who read the biopsy, and the preliminary conclusion is a focal myositis of unclear etiology." Pet'r's Ex. 8, Vol. II at 219. Throughout the remainder of Petitioner's medical record this reporting stayed consistent, and his symptoms gradually progressed to involve mild neuropathic symptoms and a rash across his back, chest, neck, and shoulder, all the areas where Petitioner was exhibiting pain.

Petitioner disputes the results of this biopsy and relies on an addendum medical record, dated January 3, 2018 noting that "overall[,] the findings and the anatomic site that is unusual for IgG4 related disease are felt to not clearly suggest this diagnosis." Pet'r's Ex. 8, Vol. II at 475. Petitioner presents this quotation as evidence that his focal myositis diagnosis "was not fully confirmed" by his muscle biopsy. Pet'r's Mot. at 28. However, a full reading of the biopsy report and its subsequent addendum reveals that despite atypical results, the treaters did not explore alternative diagnoses.. The report of the biopsy itself, written on December 26, 2017, explained that while the findings were non-specific for a certain disease process, it showed significant muscle damage, fibrotic remodeling, and prominent inflammatory cell infiltrates. *See* Pet'r's Ex. 8, Vol. II at 203. These findings "and the clinical context could fit for a presentation that has been described as 'focal myositis.'" *Id.* However, given the non-specific nature of the findings, further testing was performed on January 3, 2018, to examine the specimen for IgG and IgG4 mediated diseases. The results of this testing were added in a later addendum to Petitioner's original biopsy report, and it was this addendum that Petitioner cites in his brief. Crucially, Petitioner omits the subsequent sentence that provides the necessary context to understand the addendum. The full quotation is as follows: "Overall[,] the findings and the antatomic (sic) site that is unusual for IgG4 related disease are felt to not clearly suggest this type of diagnosis. ***The diagnosis therefore remains unchanged.***" *Id.* at 475 (emphasis added). The diagnosis of Petitioner's biopsy was focal

myositis. Therefore, if the diagnosis remained unchanged after the results of IgG and IgG4 testing, the diagnosis from the biopsy would continue to be focal myositis.

Both Dr. Srikumaran and Dr. Abrams provided opinions regarding the focal myositis diagnosis. To his credit, Dr. Abrams readily admitted his lack of expertise in focal myositis. *See* Resp't's Ex. A at 12 (Dr. Abrams stating that "I am not an expert in this condition."). Nonetheless, he argued that Malik et al. "can encompass nearly all of the symptoms and findings experienced" by Petitioner, to include "pain, rashes/skin changes, difficulty swallowing, cardiac abnormalities, muscle inflammation on MRI, and elevated inflammatory markers." Resp't's Ex. A at 12 (citing Resp't's Ex. A, Tab 1). A closer reading of Malik et al. and of Petitioner's medical record does not provide support for his assertions. As discussed above, two of the more common forms of myopathies are dermatomyositis and polymyositis. However, both dermatomyositis and polymyositis are symmetric diseases, i.e., they affect both sides of the body. *Id.* at 3–4. Petitioner's focal myositis presentation was asymmetric. Petitioner also underwent extensive cardiologic testing at his initial hospitalization, which left his providers without concern of a cardiac etiology. With regard to the laboratory findings Dr. Abrams discussed, Malik et al. explained that CK serum levels are "the most sensitive measure," with five to 50 fold increases in the case of dermatomyositis and polymyositis. Resp't's Ex. A, Tab 1 at 5. Conversely, ESR "is not a reliable indicator as it is usually normal or only mildly elevated. The same holds true for [CRP]." *Id.* This is not consistent with Dr. Abrams' claim that it is common to see the elevation of ESR and CRP markers "in systemic conditions such as myositis." Resp't's Ex. A at 12. Dr. Abrams also did not discuss why, if Petitioner did suffer from dermatomyositis or polymyositis, his CK serum levels were not elevated. In fact, it was for all of these reasons that Petitioner's treating physicians explicitly ruled out consideration of dermatomyositis and polymyositis as potential diagnoses. *See* Pet'r's Ex. 8, Vol. II at 76 ("[g]iven the lack of bilateral symptoms, presence of pain, and normal CK, there is no concern for polymoyisits (sic) or dermatomyositis."). Dr. Abrams reviewed the same evidence as Petitioner's treating physicians, though it appears he came to a different conclusion regarding the specifics of Petitioner's focal myositis diagnosis. Given Dr. Abrams' admitted lack of expertise pertaining to this diagnosis and the fact that his analysis of Petitioner's condition appears to be inconsistent with Malik et al., I am inclined to rely upon the diagnosis provided by Petitioner's treaters rather than Dr. Abrams' analysis.

Dr. Srikumaran initially opined that Petitioner's neck, back, and chest pain were due to "compensation in the surrounding musculature" from a shoulder injury, but his later report abandoned this theory in favor of both a focal myositis diagnosis and separate shoulder injury. Pet'r's Ex. 12 at 12; Pet'r's Ex. 13 at 1 ("given that the cause of myositis is largely unknown [], it is possible in this case that [Petitioner] suffered from both diagnoses."). He argued that focal myositis would not explain Petitioner's shoulder tenderness, decreased range of motion, or positive empty can test, as these symptoms "do not correlate with pain that would arise from myositis involving the chest wall and upper trap muscles." Pet'r's Ex. 12 at 12.

While Dr. Srikumaran's analysis supposes that Petitioner's focal myositis was not involved in his shoulder, he complains of shoulder symptoms that gradually progress to his trapezius muscle, neck, chest, and back, along with an accompanying skin rash. The investigation of Petitioner's reported symptoms included neurologic, cardiologic, rheumatologic, and orthopedic consultations, with each specialty ruling out potential diagnoses as Petitioner's clinical picture became clearer. About one month after the start of Petitioner's symptoms, Dr. Hirsch, a neurologist, considered SIRVA or vaccine-induced adhesive capsulitis as potential diagnoses based on her own literature search. *See* Pet'r's Ex. 8, Vol. II at 413. However, importantly, Dr. Hirsch's attending neurologist, Dr. Perlik, later added an addendum to her notes in which he opined that an "autoimmune synovial phenomena" was more likely than adhesive capsulitis due to Petitioner's imaging at the time. *Id.* at 415. One week later, another of Petitioner's physicians, Dr. Hurh, opined that Petitioner's pathology was "chronic in nature" due to significant muscle atrophy present over his supraspinatus, infraspinatus, and deltoid muscles. *Id.* at 389. Two weeks after that, Petitioner was admitted to the VA hospital, where he reported the presence of a rash encompassing his neck, left arm, and back. *See id.* at 373. These opinions would be consistent with Dr. Corriea's later opinion that Petitioner was suffering from an infectious or inflammatory condition due to a severe reaction from the flu vaccine. *See id.* at 76. Petitioner's MRI imaging throughout the course of his treatment also document edemas present in his deltoid, superior chest wall, anterior base of the neck, brachial plexus, trapezius muscle, supraspinatus muscles, and clavicle-manubrial region. *See* Pet'r's Ex. 4 at 21 (edema present in lateral head of deltoid, chest wall, and neck), 42–43 (edema present on neck, chest wall, and brachial plexus); Pet'r's Ex. 8, Vol. II at 281 (edema present on deltoid, trapezius, and supraspinatus musculature), 275 (edema present on clavicle-manubrial region). The graphics below illustrate the anatomy of the human upper body, with black circles provided to represent the estimated location of Petitioner's edemas.






*Muscle Charts of the Human Body*, PTDIRECT (last visited June 26, 2026 5:22 PM) https://www.ptdirect.com/training-design/anatomy-and-physiology/general-muscle-charts-of-the-body.

While these graphics are not substitutions for Petitioner's MRI imaging, they provide a useful tool to understand the close proximity of his edemas. The location of these edemas suggests that this was related to an overall systemic issue that was not isolated to Petitioner's chest wall and trapezius muscles, but rather involved the entire upper left quadrant of Petitioner's body, including multiple points in his shoulder. Petitioner's medical record also explicitly confirms that his myositis was involved in his left arm. *See* Pet'r's Ex. 8, Vol. II at 76 (noting a diagnosis of "[o]ther myositis, left upper [a]rm" on December 21, 2017). While Dr. Srikumaran is correct to note that Petitioner's treaters initially considered the edema present in his deltoid to be related to his flu vaccine, later imaging revealed deeper involvement in the shoulder space, and Petitioner's treating physicians opined that his entire disease process was connected via a reaction to the vaccine. *See* Pet'r's Ex. 4 at 41 (opining that an edema within the lateral head of the deltoid was "likely related to recent flu vaccination" on October 20, 2017); *but see* Pet'r's Ex. 8, Vol. II at 76 (Dr. Corriea opining that "an infectious or inflammatory process could have caused the neurologic and muscular symptoms and lab findings. He clearly had a severe reaction to the flu shot, whatever the cause," on April 4, 2018). I find this note from Dr. Corriea particularly persuasive given that it was made well into Petitioner's clinical course after several rounds of imaging and testing, and

that Petitioner's treaters then continued with this diagnosis throughout the rest of his treatment. *See* Pet'r's Ex. 8, Vol II at 174 (Dr. Fantus noting that Petitioner's symptoms are "thought to have been a reaction to [the] flu shot without a systemic myositis," on July 31, 2018).

Second, Dr. Srikumaran's analysis of Petitioner's reduced range of motion does not account for his varying presentations throughout his clinical course and does not discuss his providers' analysis of the reasons for this variation. Petitioner's providers noted that his limitations in this regard were not related to a structural issue within his shoulder, but rather his range of motion was limited due to pain. This is inconsistent with the literature filed regarding adhesive capsulitis, which Petitioner argues is one of his alleged shoulder injuries. In fact, the MRIs of Petitioner's left shoulder frequently detailed a lack of traditional SIRVA-like symptoms, such as capsulitis, subacromial bursitis, glenohumeral erosion, or synovitis. Though Petitioner's treating physicians did consider SIRVA or adhesive capsulitis to be a potential diagnosis, this was later revised to reflect his focal myositis after further imaging and testing.

"[T]he opinions of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases." *Welch v. Sec'y of Health & Hum. Servs.*, No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019). An opinion by a treating physician that is not supported by a factual basis or other evidence is conclusory in nature. And a "treating physician's recognition of a temporal relationship does not advance the analysis of causation." *Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012); *see also Robertson v. Sec'y of Health & Hum. Servs*, No. 18-554V, 2022 WL 17484980, at *17 (Fed. Cl. Spec. Mstr. Dec. 7, 2022) (finding treating physicians' statements of mere suspicion fall short of an opinion supporting vaccine causation); *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1347 (Fed. Cir. 2010) (concluding the special master did not err in affording little weight to the opinions of Petitioner's treating physicians where "none of the treating physicians concluded that the [] vaccine caused [Petitioner's condition]").

Here, the statements of Petitioner's treating physicians reflect a thorough consideration of his clinical progression that resulted in a working, maintained diagnosis throughout testing and evolving symptoms.. I rely heavily on their statements as Petitioner's treaters are "in the best position" to determine his injury and its cause. *See Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326; *Cucuras*, 993 F.3d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence."). This is supported by the remainder of Petitioner's treating physicians adjusting his course of care based on his focal myositis diagnosis following Dr. Corriea's interpretation. Accordingly, I am not persuaded by Dr. Srikumaran's arguments that there is evidence of a musculoskeletal shoulder pathology akin to SIRVA. Therefore, I find that there is preponderant evidence that Petitioner suffered from focal myositis affecting his shoulder, chest, back, trapezius, and neck following his flu vaccination in October 2017.

### B. Table Claim

In order for Petitioner to succeed on the merits of his Table SIRVA claim, he must successfully meet all four of the Table criteria discussed previously. This includes the fourth criterion, which requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms." 42 C.F.R. § 100.3(c)(10)(iv). Under the specific language and the facts

of this case, Petitioner bears the burden of establishing that any clinical evidence of focal myositis that is present is not meaningful to the existence of his symptoms. *See Durham*, 2023 WL 3196229, at *14. That is, he must "prove by preponderance of the evidence either that (a) [his] history is entirely free of, for example, clinical evidence of [focal myositis], or (b) if not, that the [focal myositis] would not explain [his] symptoms." *Id.*

As discussed above, Petitioner's history is not free of clinical evidence of focal myositis, but rather contains biopsy results consistent with this diagnosis being carried by multiple physicians. Accordingly, I find that Petitioner has failed to provide preponderant evidence to satisfy the fourth criterion. Because a petitioner is only considered to have suffered a SIRVA Table injury if all of the criteria are met, Petitioner's Table claim must fail.[22] *See* 42 C.F.R. § 100.3(c)(10).

### C. Causation-In-Fact Claim

#### 1. *Althen* Prong One

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3d at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223, (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States,* 620 F.2d 255 (Ct. Cl. 1980))).

Such medical opinions regarding vaccine causation may also be found within a petitioner's medical record in the form of statements made by his treating physicians. *Holmes v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 469, 488 (2014) ("[T]here might be circumstances in which a treating physician's opinion itself provides an adequate basis to find *Althen* prong one satisfied, for instance by containing a reliable theory explaining how the vaccine caused the injury in question."); *Volger v. Sec'y of Health & Hum. Servs.*, No. 11-424V, 2014 WL 1991851, at *7 (Fed. Cl. Spec. Mstr. Apr. 25, 2014) ("Unquestionably a treating physician's observations and deductions have probative value in establishing a petitioner's theory for how a vaccine injured him."); *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, No. 18-925V, 2023 WL 6536207, at *28 (Fed. Cl. Spec. Mstr. Sept. 11, 2023). "For instance, a doctor's diagnosis could express a belief as to how the

[22] Respondent does not contest the first two Table criteria, which require no prior history of dysfunction in the affected shoulder and that the onset of symptoms occurs within 48 hours. *See* 42 C.F.R. § 100.3(c)(10)(i)–(ii). Thus, although it would appear that Petitioner satisfies the first two Table criteria, his failure to satisfy the fourth criterion is fatal to his claim.

vaccination caused the particular injury." *Langland v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 421, 438–39 (2013) (citing *Capizzano*, 440 F.3d at 1326). However, the opinions of treating physicians are not "sacrosanct–that it must be accepted in its entirely and cannot be rebutted." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 745 n. 67 (2009). Rather, "evidence establishing the medical or scientific grounds upon which such conjecture could reasonably be based is needed." *Volger*, 2014 WL 1991851, at *7 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

In the present case, Dr. Srikumaran provides a theory of causation for a SIRVA and a similar off-Table musculoskeletal shoulder injury. Given that I have found that Petitioner's symptoms were the result of his focal myositis and not a SIRVA or SIRVA-like shoulder injury, his theories are irrelevant to this analysis. Instead, I must review the records of Petitioner's treating physicians to determine whether they contain sufficient evidence to satisfy the first prong of *Althen*. It is here that I find preponderant evidence to satisfy *Althen* prong one.

A review of Petitioner's medical records reveals that he is incredibly fortunate to have been seen by providers as thorough as those at the VA Clinic and hospital, both for the treatment of his injury and for the success of his claim. Due to his initial presentation, Petitioner's treaters first suspected either a musculoskeletal pathology involving his shoulder or a neurologic pathology in the surrounding musculature. This led to initial testing to rule out Parsonage Turner syndrome, brachial plexopathy, and cervical radiculopathy, which were all dropped from Petitioner's differential diagnosis. The lack of evidence of these conditions prompted Petitioner's treating neurologist, Dr. Hirsch, to conduct a literature search on November 6, 2017, leading her to find SIRVA and adhesive capsulitis as possible diagnoses based on two articles she included in Petitioner's medical record. Pet'r's Ex. 8, Vol. II at 146. She explained the mechanism of SIRVA as "a phenomenon in which the vaccine mistakenly enters the synovial tissues resulting in an immune-mediated inflammatory reaction." *Id.* Dr. Perlik, the attending neurologist, concurred with Dr. Hirsch's overall assessment and added that Petitioner's "radiographic features appear suggestive or compatible with" an autoimmune synovial phenomena, making note of the edemas seen on Petitioners imaging. *Id.* at 146, 148. Given their lack of expertise in these conditions, Dr. Hirsch and Dr. Perlik recommended Petitioner be seen by the orthopedics department.

Upon Petitioner's admission to the VA hospital in late November 2017, his providers initially investigated the possibility of a SIRVA or SIRVA-like injury. Throughout his hospitalization his neurologists ruled out the possibility of a neurologic etiology, and imaging did not confirm adhesive capsulitis or subacromial bursitis. It was at this point that neurologist Dr. Jiang opined that an asymmetric viral myositis could be possible, and the neurology department dropped Petitioner as a patient. Petitioner then began consultations with the rheumatology department, which eventually led to his diagnosis of focal myositis. Rheumatologist Dr. Ziauddin considered hypersensitivity due to the flu vaccine given the localized nature of his symptoms, the "edema of the musculature," and his myositis. Pet'r's Ex. 8, Vol. II at 106. This led to Petitioner's muscle biopsy, which was consistent with a diagnosis of focal myositis. Taking all of this evidence into account and discussing the case "extensively" with his attending, Dr. Correia reasoned that the lack of bilateral symptoms, presence of pain, normal CK levels, and initiation from the flu shot, "an infectious or inflammatory process could have caused the neurologic and muscular symptoms and lab findings. He clearly had a severe reaction to the flu shot." Pet'r's Ex. 8, Vol. II at 76. After

his symptoms later improved, rheumatologist Dr. Fantus opined that "because of the local nature of the problem and subsequent resolution, thought to have been a reaction to [the] flu shot without a systemic myositis." *Id.* at 174. She described the reaction as a "severe local inflammatory reaction after getting [the] flu shot into left deltoid with muscle and nerve involvement. Given local nature, clinical improvement, an[d] normalization of inflammatory markers, low suspicion for persistent myositis." *Id.* at 177.

These conclusions by Petitioner's treating physicians would also seem to be supported by the literature filed by the parties to the extent it can be generally related to focal myositis and local inflammatory reactions. Malik et al. explained that idiopathic inflammatory myopathies, such as those discussed previously, typically present with sub-acute or insidious onset, though they can have acute presentations. Resp't's Ex. A, Tab 1 at 1, 3. Cytokine development from inflammation can lead to "cell migration and mononuclear cell infiltration in muscle fibers," causing myositis. *Id.* at 6. Arias et al. noted that studies have found that antigen injection into the joint junction can result in a "strong local inflammatory response," which may injure the surrounding soft tissues and result in systemic reactions. Pet'r's Ex. 12-2 at 6. Atanasoff et al. explained that mild inflammatory reactions to vaccines, regardless of injection, typically result immediately before resolving over the next few days. Pet'r's Ex. 12-1 at 3.

Taking together this together with the statements of Petitioner's treating physicians throughout his entire clinical picture, the evidence comes together to show that a flu vaccine can cause focal myositis through an inflammatory hypersensitivity reaction. Petitioner's rheumatology providers specifically rooted their theory of causation not only in the temporal association of Petitioner's flu vaccine, but also in the lack evidence of a neurologic or musculoskeletal etiology, the localized nature of his symptoms, the biopsy results, the presence of edema in the shoulder and surrounding musculature, and the lack of evidence of a more traditional, idiopathic myositis in the form of normal CK levels, lack of bilateral symptoms, and clinical improvement upon identification of the diagnosis. They notably dropped SIRVA and adhesive capsulitis from his differential diagnosis, though they continued to pursue a vaccine-caused etiology based on the evidence above. I find these conclusions are sufficiently supported by the evidence of Petitioner's condition contained in the medical record, and thus find Petitioner has presented preponderant evidence that the flu vaccine can cause focal myositis. *See Daubert*, 509 U.S. at 597. Therefore, Petitioner has satisfied the first *Althen* prong.

### 2. *Althen* Prong Two

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine case, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting *Althen*, 418 F.3d

at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. *Cucuras*, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

Here, Petitioner's medical record is replete with his providers consistently opining that his flu vaccine caused his symptoms, even when discussing alternative etiologies. Drs. Kaimakliotis, Hirsch, Juvinall, Awan, Jiang, Moustafa, Heninger, Ziauddin, Corriea, and Fantus all connected Petitioner's condition to his flu vaccine. *See* Pet'r's Ex. 8, Vol. II at 76, 177 276, 308, 320, 379, 384, 394, 413, 419. All three of Petitioner's rheumatology providers (Drs. Ziauddin, Corriea, and Fantus) opined that his flu vaccine caused his focal myositis, specifically identifying the lack of signs present in typical idiopathic myositis such as an asymmetric presentation and normal CK levels. Respondent's arguments to this point consistent of rebutting Dr. Srikumaran's theory of muscular overcompensation, which I have already disregarded, and asserting that Petitioner's treating physicians primarily relied on a temporal relationship to establish vaccine causation. While true that a "treating physician's recognition of a temporal relationship does not advance the analysis of causation," Petitioner's treating physicians considered far more evidence than just a temporal association. *Isaac*, 2012 WL 3609993, at *26. Dr. Ziauddin pointed to the local nature and edemas surrounding the affected area in advancing his hypothesis. Following Petitioner's muscle biopsy, Dr. Corriea noted that Petitioner's asymmetric presentation and normal CK levels were inconsistent with a typical idiopathic myositis, thus leading him to opine on vaccine causation. Dr. Fantus brought these conclusions together, in addition to Petitioner's improvement of symptoms, as further evidence of a vaccine-induced reaction, as a traditional case of myositis would have persisted. These conclusions are based on far more than a mere temporal association, and I find them to be preponderant evidence of a logical sequence of cause and effect to show that Petitioner's flu vaccine was the cause of his injury. Therefore, Petitioner has satisfied *Althen*'s second prong.

### 3. *Althen* Prong Three

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationship." *Id.* Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. CL. At 542; *see Pafford*, 451, F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does not constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. CL. At 356. (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury").

Given that Petitioner and his expert identified the temporal relationship of vaccine causation in relation to SIRVA or SIRVA-like injuries, it is inapplicable to Petitioner's focal myositis diagnosis. However, Petitioner's treating physicians identified the mechanism of injury as a localized hypersensitivity inflammatory reaction resulting in focal myositis. Accordingly, I can rely on the literature filed as it relates to focal myositis and inflammation from the flu vaccine, as well as the conclusions of Petitioner's treating physicians, to examine the existence of an appropriate temporal relationship between vaccination and symptom onset.

Malik et al. explained that myositis can present in acute forms and is generally thought to be the result of cytokine migration into the muscle fibers from inflammation. Resp't's Ex. A, Tab 1 at 3. Arias et al. and Atanasoff et al. explained the general process of inflammatory reactions that result from vaccination, which typically occur immediately before subsiding over the course of a few days. Pet'r's Ex. 12, Tab 1 at 3; Pet'r's Ex. 12, Tab 2 at 6. It would follow that an abnormal hypersensitivity reaction, such as in this case, would not subside, but instead worsen. This would be consistent with Petitioner's presentation, as he initially reported pain in his shoulder and neck two days after vaccination, and by four days vaccination his pain had spread to his chest, back, and trapezius muscle, with edemas present. Approximately one month after vaccination he developed a rash across the affected areas of his body. Petitioner's treating physicians also found this course of events in relation to Petitioner's flu vaccine to be appropriate, and given the supporting evidence, I see no reason to deviate from their conclusions. Accordingly, Petitioner has provided preponderant evidence to show an appropriate temporal relationship between his vaccination and his focal myositis, and therefore has satisfied *Althen*'s third prong.

### D. Alternative Causation

Because I conclude that Petitioner has established a prima facie case, Petitioner is entitled to compensation unless Respondent can put forth preponderant evidence "that [Petitioner's] injury was in fact caused by factors unrelated to the vaccine." *Whitecotton v. Sec'y of Health & Hum. Servs.*, 17 F.3d 374, 376 (Fed. Cir. 1994), *rev'd on other grounds sub nom.*, *Shalala v. Whitecotton*, 514 U.S. 268 (1995); *see also Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007). As discussed above in the analysis, while I agree with Respondent that Petitioner's focal myositis caused his symptoms, I also find that his focal myositis was caused-in-fact by his flu vaccine. Thus, Respondent did not prove by a preponderance of the evidence that Petitioner's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B).

## VII. Conclusion

For the reasons discussed above, I find that (1) Petitioner did not satisfy the SIRVA Table criteria and (2) that Petitioner did not established by preponderant evidence that his flu vaccine caused him to suffer a shoulder injury. However, I find that that Petitioner did establish by preponderant evidence that his flu vaccine caused him to suffer from focal myositis. Therefore, Petitioner is entitled to compensation. A separate damages order will issue.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master